IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2005

**STATE OF TENNESSEE v. LARRY PORTER**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-03876    Bernie Weinman, Judge**

**No. W2004-01584-CCA-R3-CD  - Filed March 30, 2005**

The Defendant, Larry Porter, was convicted of aggravated assault, and the trial court sentenced the Defendant to eight years, as a multiple offender. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court erred when it sentenced him. Finding no reversible error in the judgment of the trial court, we affirm the Defendant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and ALAN E. GLENN, JJ., joined.

Donna J. Armstard (at trial), and Garland Ergüden (on appeal), Memphis, Tennessee, for the appellant, Larry Porter.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Emily Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a crime committed against the victim, Jerry Robinson, on September 7, 2002. With regard to this crime, the Shelby County Grand Jury indicted the Defendant for especially aggravated robbery. At trial, a jury convicted the Defendant of the lesser-included offense of aggravated assault, and the trial court sentenced him to eight years in prison. At the Defendant's trial, the following evidence was presented: Jerry Robinson, the victim, testified that he had known the Defendant for "years." Robinson said that he worked as a bail bondsman and had previously "bailed" the Defendant out of jail. He said that, on September 7, 2002, he was at home, in a rooming house at 1115 Patton Street, when the Defendant and two other men came into his room. Robinson recalled that the Defendant and two other men surrounded him and demanded to know "Where . .

. the money [was]?" Robinson said that he asked the three men what they meant, and, suddenly, the three men started hitting him. He recalled that all three men dragged him out to the front porch of the rooming house and continued to beat him. Robinson stated that Roderick Harris, one of the two men with the Defendant, took Robinson's red and white cane and began striking him with it. He recalled that the Defendant picked up a stick and began hitting Robinson on the back. Robinson testified that all three men beat, kicked, and stomped him, kicking him at least once in the eye. Robinson said that, following the beating, the three men got into a red car, driven by the unidentified third man, and drove away.

Robinson testified that he walked down the street, and a woman named Shirley Crump drove him to the hospital. Robinson stated that he suffered severe injuries as a result of the beating. He said that his right eye was too swollen for doctors to examine, and surgery is required to restore his vision. Robinson said that he had welts and bruises on his body. Robinson further explained that he suffered a laceration on his head that required stitches. Robinson testified that, after spending the night at the hospital, he returned home and called the police. He said that officers came to the boarding house, photographed his injuries and the crime scene, and collected the stick with which the Defendant struck Robinson repeatedly. Robinson recalled that, at an earlier hearing in this case, the Defendant apologized to him.

Robinson testified that when the three men first came to his room he was not afraid because he knew that these men were friends with his landlord, but he became afraid when the men attacked him. He recalled that he had $300 in his back pocket before the attack, and, although he was uncertain whether he had the money immediately following the attack, he no longer had the $300 when he was released from the hospital.

On cross-examination, Robinson testified that the hallway through which the Defendant and the other two men drug Robinson is narrow, but wide enough for three people to walk at the same time. He said that he knew most of the five residents at the rooming house, and he denied that Harris was a resident at the rooming house. He testified that some of his fellow residents and neighbors were home and witnessed the attack, but he did not yell for help. Robinson admitted that Roderick Harris worked for Robinson's landlord. He denied that the three men came to his room attempting to collect Robinson's past-due rent. Robinson recalled that the Defendant hit him with the stick and Harris beat him with a cane. He could not say how many times either man struck him, because the three men were beating him all at once. He admitted that he previously testified that the Defendant did not have a weapon and only kicked Robinson in the eye, but he explained that, at that hearing, he did not recall the events clearly. He denied that there was any argument before the three men attacked him, and he denied striking the first blow with his cane. He said that he walked about two blocks before Crump picked him up. Robinson said that he began walking because the phone in the rooming house did not always work, and he did not think anyone inside would help him. He said that the attack occurred between 9:00 p.m. and 10:00 p.m., and he arrived at the hospital in this same time frame.

Robinson said that the hospital gave him the name and number of a doctor's office to contact

for a follow-up examination. He said that he returned to the hospital when the swelling in his eye lessened, but he could not remember whether this was later the same week, or the following week. He admitted that the eye doctor diagnosed his eye problem, in part, as glaucoma, but he denied that he had been diagnosed with glaucoma prior to the attack. Robinson said that the hospital referred him to a clinic, but, due to financial constraints, he went to see the eye specialist for whom his sister works. He could not recall when he first went to see the eye specialist. Robinson said that the eye specialist referred him to a second specialist for surgery, but he has been unable to afford the surgery. On redirect examination, Robinson explained that his vision was clear before he was beaten, but, following the beating, he is unable to see out of his right eye. On re-cross examination, he said that he has worn glasses since he was twenty years old.

Sergeant Cham Payne, of the Memphis Police Department, testified that he worked the crime scene at Robinson's address on September 8, 2002, the day after the incident. He recalled that, when he arrived, he noticed a stick lying on the ground on the front porch of the rooming house. He also noted that there were blood stains present on the porch. The sergeant said that he took photographs of the scene and Robinson's injuries, and he also collected the stick as evidence. On cross-examination, Sergeant Payne said that he did not go inside the rooming house when he processed the scene because he was informed that the incident took place outside on the front porch. The sergeant recalled that, when he arrived, a patrol officer was already at the scene.

Detective Terry Thompson testified that, in September 2002, he was an investigator in the robbery division of the Memphis Police Department, and he was assigned to investigate Robinson's case. The detective recalled that he interviewed Robinson and, based on this interview, the detective developed three suspects: the Defendant, Roderick Harris, and an unidentified third man. Detective Thompson said that he showed Robinson a photographic line-up approximately three weeks after Robinson was attacked, and Robinson identified the Defendant without hesitation.

The Defendant testified that he knows Robinson, and he knows Harris. The Defendant recalled that, at around 8:00 p.m., on September 7, 2002, he, Harris, and a third man named Zoe, were drinking beer and "hanging out" at a rooming house owned by Robinson's landlord. He said that Zoe received a telephone call and requested that Harris and the Defendant accompany him to the landlord's other rooming house, on Patton Street. He said that Robinson and Harris both lived at the Patton Street house. He recalled that, after Harris opened the front door with his key, the Defendant followed Zoe and Harris into the building. He explained that Zoe and Harris entered Robinson's room to question him about over due rent money, while the Defendant remained in the hallway. He stated that Robinson "jumped up and said 'I already talked to [the landlord],' and [Robinson] was shouting at them and the next thing that I kn[ew] he swung his cane." He recounted that Robinson struck Zoe with the cane, Zoe grabbed Robinson, and the men began "tussling." He recalled that Robinson dropped the cane and "broke toward [the Defendant]." The Defendant said that he watched these events from outside Robinson's room, and he did not enter the room. He testified that, when Robinson ran towards him, he pushed Robinson away, and Robinson ran out the front door with Zoe and Harris running after him. The Defendant said that when he went outside Robinson was already on the ground. He recalled that Zoe was beating Robinson with the cane, and

Harris was kicking and stomping Robinson. He stated that he "got on out of the way." He said that Harris took a shoe and struck Robinson repeatedly in the face. The Defendant said that the altercation lasted a brief time, and then all three men drove away together. He said that he did not attempt to stop the beating or to call the police.

On cross-examination, the Defendant testified that Zoe lived in and ran the rooming house where the three men were before the incident. He explained that Zoe received a call from the landlord regarding Robinson's rent money. The Defendant testified that, when the other two men entered Robinson's room, he watched from the opposite end of the ten to fifteen foot long hallway. He said that he watched, but did not participate in the fighting. He testified that he pushed Robinson when Robinson ran past him, but he denied "slam[ming] [Robinson's] face into a door." He denied that anyone dragged Robinson outside. The Defendant denied that anyone struck Robinson with a stick, and he said that he did not ever hit or kick Robinson. He said that no one took any money from Robinson. He recalled that, after Zoe and Harris beat Robinson, the Defendant returned with the other two men to the other rooming house, where Harris called to check on Robinson. He denied that he apologized to Robinson at a previous court proceeding. On redirect examination, the Defendant testified that, when Harris called to check on Robinson's condition, Harris was told that Robinson was "fine."

Following this evidence the jury convicted the Defendant of aggravated assault. At the Defendant's sentencing hearing, based on the evidence presented at trial and the Defendant's pre-sentence report, the trial court found that six enhancement factors were applicable. The trial court stated:

> The Court finds that the [D]efendant is in fact a Range Two multiple offender, and that he has a history, a criminal history that far, far exceeds the necessary crimes to establish the appropriate range. He has many, many, many convictions, pages of them.
>
> The victim, as the Court recalls . . . was hurt [and] had extreme injuries, in fact, to the point of he says his eye sight or he's lost sight in one eye and had not recovered at the time of the trial.
>
> The [D]efendant has a history of unwillingness to comply with the conditions of being released into the community. He's violated probation before, that the [D]efendant has no hesitation in being involved in crimes that – where serious bodily injury could be involved.
>
> And also based on testimony, the Court is of the – I think the records would reflect the [D]efendant had been released on probation at the time this was committed. He was out on probation when this crime was committed.
>
> So the Court is of the opinion that a sentence of eight years and a fine of $500

-4-

would be appropriate in this matter . . . .

## II. Analysis

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated assault, because the evidence consisted solely of the victim's testimony, which the Defendant claims lacks credibility. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Aggravated assault is "intentionally . . . knowingly . . . or recklessly commit[ting] an assault" and either "caus[ing] serious bodily injury" or "us[ing] or displaying a deadly weapon." Tenn. Code Ann. § 39-13-102 (2003). Assault is defined as occurring when a person:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101 (2003).

The victim, Robinson, testified that the Defendant and two other men came to his home and surrounded him. He testified that the three men began beating him and dragged him outside, where the three men beat Robinson with a stick and a cane and kicked him repeatedly. Robinson identified the Defendant and testified that the Defendant beat him with a stick. As a result of the beating, Robinson suffered multiple lacerations and bruises, and lost the sight in his right eye. Although the Defendant claims that he was merely a bystander and not a participant in the crime, the jury obviously credited the victim's testimony on this point. Therefore, we conclude this evidence is sufficient to sustain the Defendant's conviction for aggravated assault.

## B. Sentencing

The Defendant asserts that the trial court's application of sentence enhancing factors was improper in light of the United States Supreme Court's decision in Blakely v. Washington, 524 U.S. ____, 124 S. Ct. 2531 (2004).

When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The United States Supreme Court's recent opinion in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." <u>Id.</u> Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2539.

The Defendant asserts that his sentence is excessive in light of the United States Supreme Court decision in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531 (2004). The State counters that the Defendant has waived this argument by not raising the issue at his sentencing hearing, and alternatively, that the Defendant's sentence does not violate the mandate set forth in <u>Blakely</u>.

First, we note that the Defendant has not waived this issue. In <u>State v. Chester Wayne Walters</u>, we held that, because <u>Blakely</u> announced a new rule, any defendant whose case was still on direct appeal could raise this issue. <u>State v. Chester Wayne Walters</u>, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *19 (Tenn. Crim. App., at Nashville, Nov. 30, 2004). We explained that, although <u>Blakely</u> was the Supreme Court's explanation of its prior decision in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), the Tennessee Supreme Court had previously announced that the rule in <u>Apprendi</u> did not affect our State's sentencing scheme. As a result, the mandate of <u>Blakely</u> created a new rule in Tennessee. Furthermore, in <u>Walters</u>, this Court held that <u>Blakely</u> could be raised in all cases on direct appeal, because a violation of this mandate was plain error arising from the deprivation of the Constitutional right to a jury trial. <u>See also</u> <u>State v. Charles Benson</u>, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *7–10 (Tenn. Crim. App., at Nashville, Oct. 8, 2004).

Thus, the question becomes whether the sentence imposed by the trial court violates the United States Supreme Court mandate in <u>Blakely</u>. At the Defendant's sentencing hearing, the trial court found that the following enhancement factors applied: (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (6) the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; (7) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; (9) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (11) the defendant had no hesitation about committing a crime when the risk to human life was high; and (14) the felony was committed while on probation from a prior felony conviction. Tenn. Code Ann. § 40-35-114(2), (6), (7), (9), (11), (14). The trial court then sentenced the Defendant to eight years in prison, as a Range II multiple offender.

The sentence range for a Class C felony, Range II offender is six to ten years. Tenn. Code

Ann. § 40-35-112 (2003). In calculating the sentence for a Class C felony conviction, the presumptive sentence is the statutory minimum for a Range II offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e).

The trial court properly found that the Defendant has a prior history of criminal convictions, and this finding does not violate Blakely. None of the other enhancement factors used by the trial court to enhance the Defendant's sentence, however, were submitted to a jury or admitted by the Defendant. Therefore, the rule in Blakely precludes application of any of these factors except the enhancement factor based on the Defendant's prior criminal convictions. Because there was only one enhancement factor properly applied by the trial court, the Defendant's sentence must be modified, unless the error was harmless beyond a reasonable doubt. See Walters, 2004 WL 2726034, at *22.

In Walters, this Court held that Blakely violations are subject to a Constitutional harmless error analysis. Id. at *24. "While it is true that Blakely concerns the inviolate right to a jury trial, the cornerstone upon which our criminal justice system was constructed, we cannot say that a jury's failure to determine an enhancement factor 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Id. (quoting Needer v. United States, 527 U.S. 1, 9 (1999)). Thus, before we modify the Defendant's sentence, we will "review the Blakely errors to determine whether they were harmless beyond a reasonable doubt." Id.; see Chapman v. California, 386 U.S. 18, 24 (1967).

First, we examine the trial court's application of enhancement factor (9), concerning the Defendant's prior unwillingness to comply with the terms or conditions of probation or release. The record reflects that the Defendant violated the terms or conditions of his release on more than one occasion. The Defendant's presentence report details that he was convicted of violating his probation on four separate occasions: May 28, 1998; November 30, 1994; October 16, 1991; and March 22, 1991. Further, there was no evidence presented to contradict this fact. Therefore, we hold that the trial court's application of enhancement factor (9) was harmless error.

Conversely, we hold that the trial court's application of enhancement factor (14), that the Defendant was on probation from a prior felony conviction at the time he committed the offense, was not harmless error. Based on the record before us, we are unable to conclude that the Defendant was on probation for a felony when he committed the offense in this case. The presentence report shows that the Defendant has only two prior felony convictions, the most recent in 1996 for which he received a two year sentence. The most recent prior offense noted in the Defendant's presentence

report is a misdemeanor conviction from January 14, 2002.[1] Thus, the application of factor (9) is not harmless beyond a reasonable doubt.

Next, we turn to the application of factor (6), that the Defendant treated the victim with exceptional cruelty. "Exceptional cruelty" is too conclusory for this Court to say that the application of this factor was harmless beyond a reasonable doubt. We conclude that this is the type of subjective conclusion that must be left within the jury's province pursuant to Blakely. Accordingly, the trial court's application of this factor is not harmless beyond a reasonable doubt. Likewise, we conclude that the application of factor (7), that the injuries suffered by the victim were particularly great, was not harmless error. Although the jury implicitly found that the Defendant caused "serious bodily injury" when it found him guilty of aggravated assault, "particularly great" is a subjective conclusion best left to the province of the jury. Finally, enhancement factor (11), that the Defendant did not hesitate to commit a crime when the risk to human life was high, was not found by the jury or admitted by the Defendant. This factor, like factors (6) and (7), requires a subjective conclusion that must be left to the jury. Thus, we hold that the trial court's application of this factor was not harmless beyond a reasonable doubt.

In summary, the trial court improperly applied enhancement factors (6), (7), (11), and (14), but it properly considered factor (2), regarding the Defendant's history of prior criminal convictions. Accordingly, because factor (2) was properly applied by the trial court, the trial court properly enhanced the Defendant's sentence from six years to eight years. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's conviction and sentence.

_____

ROBERT W. WEDEMEYER, JUDGE

---

[1]The presentence report shows that the Defendant was charged with aggravated burglary, but entered a guilty plea to "criminal attempt misdemeanor."